251 N.J. Super. 516 (1991)
598 A.2d 948
VANTAGE DEVELOPMENT CORP., INC., A NEW JERSEY CORPORATION AND ROCKLEE, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
AMERICAN ENVIRONMENT TECHNOLOGIES CORP., AND PETER MELBER, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Bergen County.
Argued June 14, 1991.
Decided July 18, 1991.
*518 Stephen D. Cuyler, for Selective Insurance Company of America (Cuyler, Burk & Matthews, attorneys; Stephen D. Cuyler and Anne M. Mohan on the briefs).
Bruce D. Nimensky, for Vantage Development Corp., Inc. and Rocklee, Inc. (Berger & Bornstein, attorneys; Bruce D. Nimensky on the briefs).
*519 LAWRENCE D. SMITH, J.S.C.
The primary issue raised in this case addresses the scope and meaning of the so-called "absolute pollution exclusion" which was recently incorporated in general liability policies of insurance. Does that exclusion preclude coverage for remediation expenses incurred to prevent the migration to neighboring properties of oil deposited on an insured's property by a trespasser? For the reasons which follow, I find coverage is excluded.
Plaintiffs, Rocklee, Inc., and Vantage Development Corp., Inc. (Vantage), seek to recover under two policies of insurance for remediation expenses incurred in connection with an oil spill which occurred on January 29, 1989, on property owned by Rocklee and located at 16 Paris Avenue, Rockleigh, New Jersey. Vantage, a successor in title to Rocklee, ostensibly has no interest under the policies. Rocklee attributes the spill to the acts of an unknown party. As a consequence of those acts, oil flowed into an adjoining waterway and eventually into the Sparkill Creek in Orange County, New York. On January 30, 1989, American Environment Technologies Corp. (AET) was retained to clean up and prevent the spread of oil to neighboring properties. AET proceeded with cleanup activities[1] which consisted of containing the oil spill, testing to determine the extent of contamination, excavating and removing contaminated soil.
Two policies of insurance are involved  a standard fire insurance policy which also covers various additional enumerated risks and perils and a comprehensive general liability insurance policy  both issued by Selective Insurance Co. (Selective). Rocklee theorizes that both policies provide coverage for costs incurred for containment, soil testing and soil removal. The *520 spill produced no damage to property other than damage to soil and a brook. Buildings were not damaged. Selective moves for summary judgment.
The comprehensive general liability policy provides coverage for:
all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto....
Claims for damages resulting from the discharge of pollutants or contaminants are excluded by the following provision:
It is agreed that each and every exclusion and any exception(s) to such exclusion forming a part of this policy and relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants are replaced in their entirety by the following exclusion:
The company shall have no obligation under this policy (1) to investigate, settle or defend any claim or suit against any insured alleging actual or threatened injury or damage of any nature or kind to persons or property which arises out of or would not have occurred but for the pollution hazard; (2) to pay any damages, judgements, settlements, losses, costs or expenses of any kind or nature that may be awarded or incurred by reason of any such claim or suit or any such actual or threatened injury or damage; or (3) for any losses, costs or expenses arising out of any obligation, order, direction or request of or upon any insured, including but not limited to any governmental obligation, order, direction or request, to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize irritants, contaminants or pollutants.
"Pollution hazard" means an actual exposure or threat of exposure to the corrosive, toxic or other harmful properties of any solid, liquid, gaseous, or thermal pollutants, contaminants, irritants or toxic substances, including smoke, vapors, soot, fumes, acids or alkalis, and waste materials consisting of or containing any of the foregoing arising out of the discharge, dispersal or release or escape of any of the aforementioned irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water. Waste material includes any materials which are intended to be or have been recycled, reconditioned or reclaimed.
The existence of a broad, comprehensive pollution exclusion was signalled by a separate notice provision which reads:

*521 ATTENTION
IMPORTANT NOTICE
Re: Pollution Exclusion
This policy contains an absolute Pollution Exclusion (Form 943). This means, under this policy, there is no coverage for any liability which any insured may have for damages arising out of pollution.
Clean-up and defense costs arising out of pollution are also not covered under this policy.
We urge you to read Form 943 carefully and discuss any questions with your agent.
The capitalized words, "Attention," "Important Notice," are set forth in bold print, the largest and most prominent print in the Package of documents which comprise the policy. The verbiage highlighted in the quotation, "no coverage" and "also not covered," are also set forth in bold print which immediately strikes the eye.
The pollution exclusion itself, which is styled in the notice provision as "absolute," has been so viewed by several courts. See Alcolac, Inc. v. California Union Ins. Co., 716 F. Supp. 1546, 1549 (D.Md. 1989); Budofsky v. Hartford Ins. Co., 147 Misc.2d 691, 556 N.Y.S.2d 438, 440 (Sup.Ct. 1990). Plaintiffs ostensibly concede that oil is a pollutant. See United States v. Standard Oil Co., 384 U.S. 224, 226, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492 (1966) (oil is a pollutant when introduced into the waterways); Guilford Industries Inc. v. Liberty Mut. Ins. Co., 688 F. Supp. 792 (D.Me. 1988), aff'd 879 F.2d 853 (1 Cir.1989). See also Broadwell Realty v. Fid. & Cas., 218 N.J. Super. 516, 528 A.2d 76 (App.Div. 1987).
Selective contends the absolute pollution exclusion precludes coverage for losses arising out of any spillage, release or discharge of oil.[2] Rocklee contends the exclusion was not *522 intended to preclude reimbursement for expenses incurred to contain and remove pollutant "dumped" on an insured's property by a trespasser, at least to the extent that those expenses were incurred to prevent migration of contaminant to neighboring properties. See Broadwell Realty, supra, 218 N.J. Super. at 525, 528 A.2d 76. The relevant facts are undisputed and the issues ripe for summary disposition. Michaels v. Brookchester, Inc., 26 N.J. 379, 387, 140 A.2d 199 (1958); Trucking Employers of No. Jersey v. Vrablick, 177 N.J. Super. 142, 425 A.2d 1068 (App.Div. 1980).
In interpreting an insurance policy, a court may not ignore the clear and certain terms of a policy or change their meaning in an effort to construe them. When the policy is clear and unambiguous, the parties are bound by the language used and the court must accordingly give it effect. Longobardi v. Chubb Ins. Co. of N.J., 121 N.J. 530, 537, 582 A.2d 1257 (1990); Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 35, 548 A.2d 188 (1988).
If, on the other hand, the language of a policy will support two interpretations, one favorable to the insured and the other favorable to the insurer, a court is obligated to apply that interpretation which favors coverage. Butler v. Bonner and Barnwell, Inc., 56 N.J. 567, 576, 267 A.2d 527 (1970); Ohio Cas. Ins. Co. v. Flanagin, 44 N.J. 504, 513-514, 210 A.2d 221 (1965); Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7, 170 A.2d 800 (1961); Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961); Sinopoli v. No. River Ins. *523 Co., 244 N.J. Super. 245, 251, 581 A.2d 1368 (App.Div. 1990). If there is any doubt, uncertainty or ambiguity in the phraseology of a policy, or if that phraseology is susceptible to two meanings, a construction favoring coverage must be adopted. Ohio Cas. Ins. Co., supra, 44 N.J. at 513, 210 A.2d 221; Kook v. Am. Sur. Co. of N.Y., 88 N.J. Super. 43, 52, 210 A.2d 633 (App.Div. 1965).
The language of the policy must be read to determine the understanding that would be assigned by the general public, Kievit, supra, 34 N.J. at 488, 170 A.2d 22; Parnell v. Rohrer Chev. Co., 95 N.J. Super. 471, 480, 231 A.2d 824 (App. Div. 1967); Edgewater Nat'l Bank v. Safeguard Ins. Co., 81 N.J. Super. 383, 388, 195 A.2d 653 (App.Div. 1963), so as to fulfill "the reasonable expectations of the average purchaser in the light of the contract language." Linden Motor Freight v. Travelers Ins. Co., 40 N.J. 511, 193 A.2d 217 (1963); Allen v. Metropolitan Ins. Co., 44 N.J. 294, 305, 208 A.2d 638 (1965); Sinopoli, supra, 244 N.J. Super. at 251, 581 A.2d 1368. Those expectations, however, must be "objectively reasonable." Werner Industries, supra, 112 N.J. at 35, 548 A.2d 188; Broadwell Realty, supra, 218 N.J. Super. at 524, 528 A.2d 76. The focus is and must be on the language of the policy.
When dealing with clauses of exclusion, strict interpretation is required. Mazzilli, supra, 35 N.J. at 8, 170 A.2d 800; Sinopoli, supra, 244 N.J. Super. at 250, 581 A.2d 1368. One factor which courts "necessarily consider" is whether the insurer, by the use of "alternative or more precise language," could have "put the matter beyond reasonable question." Mazzilli, supra, 35 N.J. at 7, 170 A.2d 800; Ohio Cas. Ins. Co., supra, 44 N.J. at 513, 210 A.2d 221; American Legion Hosp. v. St. Paul Fire Ins. Co., 106 N.J. Super. 393, 397, 256 A.2d 57 (App.Div. 1969); Kook, supra, 88 N.J. Super. at 51, 210 A.2d 633. That approach, however, must be tempered, at least to some degree, by an appreciation of the fact that language can rarely be totally precise. Interpretational difficulties must be *524 real, genuine and not fanciful. Cf. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788 (1979).
It is Selective's burden to demonstrate that coverage does not exist. Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 399, 267 A.2d 7 (1970); Sinopoli, supra, 244 N.J. Super. at 251, 581 A.2d 1368; Aetna v. Weiss, 174 N.J. Super. 292, 296, 416 A.2d 426 (App.Div. 1980). Selective must show that the policyholder's interpretation as to the meaning of the exclusionary clause is unreasonable. Aetna v. Weiss, supra at 296, 416 A.2d 426; Hanover Ins. Group v. Cameron, 122 N.J. Super. 51, 59, 298 A.2d 715 (Ch.Div. 1983).
The fundamental issue presented relates to whether the pollution exclusion is ambiguous in light of the facts involved. Analysis must commence with obeisance to the premise that it is objectively reasonable for an insured to expect to receive coverage under a general liability policy for those expenses associated with remediation efforts which are designed to prevent migration of pollutants to adjacent properties,[3] at least where the peril is "both imminent and immediate." Broadwell Realty v. Fid. & Cas., supra, 218 N.J. Super. at 526-528, 528 A.2d 76 so held. See also Diamond Shamrock v. Aetna Cas., 231 N.J. Super. 1, 10, 554 A.2d 1342 (App.Div. 1989); Summit Assocs. Inc. v. Liberty Mut. Fire Ins. Co., 229 N.J. Super. 56, 550 A.2d 1235 (App.Div. 1988). The policy involved in Broadwell Realty, however, did not include an exclusion for pollution related damages comparable to the absolute pollution exclusion. The question which must be addressed is whether the exclusionary language previously quoted, strictly construed, excludes that which the assured, in the first instance under Broadwell Realty, could reasonably expect would be covered.
*525 The form of pollution exclusion in current use is expressed by different insurance companies in different, albeit essentially equivalent, ways. Commencing in the mid-1980's exclusionary provisions were drafted in a fashion which suggested absolute exclusion of such claims. Formerly, the standard pollution exclusion permitted coverage for damages resulting from the discharge, dispersal, release or escape of contaminants or pollutants when "sudden and accidental." Commentators have suggested that the quoted language, from the perspective of the insurance industry, was too frequently construed in a strained or tortured fashion, in a manner which distorted the terminology and thereby "frustrated" the intent of the industry. In addition, claims experience demonstrated enormous expense and exposure resulting from the "explosion" of environmental litigation. Broadwell Realty, supra, 218 N.J. Super. at 522-23, 528 A.2d 76. As a result, the insurance industry structured an absolute exclusion.[4] While the provision in current use, which is indeed ostensibly absolute, may have the effect of "frustrating" the abstract coverage wishes and desires of policyholders, the language of the exclusion is clear and cannot be viewed as frustrating their reasonable expectations in light of that policy language.
The present exclusion in its varying forms has been the subject of considerable judicial attention over the past several years. The courts have virtually universally agreed that the provision is clear, unambiguous and enforceable. In addition to a host of unreported decisions which have been brought to my attention, several in New Jersey, the following reported decisions have, in divers situational contexts, treated the exclusion as absolute: Alcolac, Inc. v. California Union Ins. Co., supra; Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118 (2 *526 Cir.1990); Guilford Industries Inc. v. Liberty Mut. Ins. Co., 688 F. Supp. 792 (D.Me. 1988), aff'd 879 F.2d 853 (1 Cir.1989); Budofsky v. Hartford Ins. Co., supra; League of Minn. Cities Ins. v. Coon Rapids, 446 N.W.2d 419 (Minn. Ct. App. 1989); see also New Castle County v. Hartford Acc. and Indem. Co., 673 F. Supp. 1359 (D.Del. 1987); Hydro Systems, Inc. v. Continental Ins. Co., 717 F. Supp. 700 (C.D.Cal. 1989); Perkins Hardwood Lumber v. Bituminous Cas. Corp., 190 Ga. App. 231, 378 S.E.2d 407 (1989); Reliance Ins. Co. v. Kent Corp. Inc., 896 F.2d 501 (11 Cir.1990). Alcolac, supra, is frequently cited. In Alcolac the court concluded: "This pollution exclusion is just what it purports to be  absolute  and the court perceives no reason why [the insurer] should be denied the benefit of its bargain." 922 F.2d at 1549. See also Budofsky, supra, 556 N.Y.S.2d at 440.
Confronted with the absolute exclusion, the only issue which several courts have viewed as preserved relates to whether a particular substance constitutes a contaminant, pollutant or irritant. See In re Hub Recycling Inc., 106 B.R. 372 (D.N.J. 1989); Titan Holdings Syndicate, Inc. v. City of Keene, N.H., 898 F.2d 265 (1 Cir.1990). That potential issue is not implicated in this case.
Rocklee does not point to any inconsistency within the policy. Rather, Rocklee argues that costs incurred as a result of oil deposited on its property by a third-party trespasser are outside the presumed intention of the pollution exclusion. Plaintiff urges that illegal dumping should not be viewed as tantamount to a "discharge, dispersal or release or escape" of a pollutant, suggesting that the words used in the policy permit of an interpretation that the act of discharge, dispersal, release or escape must be attributable to the insured. Reliance for that position is placed on Molton, Allen & Williams, Inc. v. St. Paul F. & M. Ins., 347 So.2d 95 (Ala.Sup.Ct. 1977). However, the court in Molton, Allen was not construing the absolute pollution exclusion, but the predecessor form of the pollution exclusion which permitted coverage for damages which were *527 not "sudden or accidental" and were "neither expected nor intended from the standpoint of the insured." That language was viewed by the court in Molton, Allen as intended "to eliminate coverage for damages arising out of pollution or contamination by industry-related activities." Id. at 99. See also In re Hub Recycling, Inc., supra. The rationale for the present pollution exclusion is vastly different  to eliminate all pollution claims.[5]
In an effort to circumvent the clear, literal meaning of the exclusion, Rocklee postulates that "the purpose of the pollution exclusion is to force those owners of businesses which use ... toxic wastes to use all available efforts to prevent a spill, release, discharge or escape of such pollutants." That thesis, although arguably appropriate to an exclusion which preserves coverage for sudden, accidental damages (see Broadwell Realty, supra, 218 N.J. Super. at 533, 528 A.2d 76; Niagara County v. Utica Mut. Ins. Co., 439 N.Y.S.2d 538, 540, 80 A.D.2d 415 (App.Div.), app. dism. 54 N.Y.2d 608, 443 N.Y.S.2d 1030, 427 N.E.2d 1191 (1981); Molton, Allen, supra), cannot be derived from the language of the subject exclusion and plaintiff has not provided any substantiation to support such a conclusion.[6] The argument presupposes that the exclusion was the product of altruistic motives[7] on the part of the insurance industry; namely, to promote socially desirable goals and not simply to eliminate *528 enormous exposure.[8] That premise is unfounded; the purpose of the exclusion is not as subtle as Rocklee chooses to presume. The purpose of the exclusion, given its historical evolution, is to accomplish that which the language of the special notice asserts  to "absolutely" eliminate coverage for pollution claims, however caused. The scope and breadth of the provision coupled with the catalogue of excluded events, reflects a studied effort to accomplish just that. By its terms, the pollution exclusion is not geared to fault, responsibility or causation on the part of or by the insured. Coverage is excluded for all pollution claims no matter how caused. Indeed, the policy excludes coverage for the "escape" of pollutants, a term which to a large degree implies passivity on the part of the insured.
Several courts have applied the exclusion where the insured's activities were ostensibly unrelated to the resulting damage. In Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118 (2 Cir.1990), an act of vandalism caused fuel oil which the insured stored on its property to flow into adjacent waterways. The court there concluded that "the plain meaning of the endorsement precludes coverage for the oil spill." Id. at 122. In Guilford Industries, Inc. v. Liberty Mut. Ins. Co., 688 F. Supp. 792 (D.Me. 1988), aff'd 879 F.2d 853 (1 Cir.1989), a river bearing the improbable name Piscataquis overflowed, causing a rupture to Guilford's oil pipes. Oil flowed downstream, resulting in property damage. The Maine Department of Environmental *529 Protection notified Guilford that it was responsible for the clean-up as well as for any damage claims which might be brought by downstream property owners. Guilford sought a declaration that it was covered for such damage claims. The court did not consider lack of fault or responsibility to be a basis for circumventing the clear and unambiguous language of the policy, language which was functionally equivalent to the language involved in this case. That exclusionary language was viewed as clearly expressing an intention to exclude all discharges of pollutants, however caused. Cf. Budofsky, supra (coverage was excluded for damages resulting from an insured's tenants' activities in releasing toxic substances). In short, the manner of release, whether with or without the involvement of the insured, or whether based on activities of the insured, is not a relevant consideration in determining the applicability of the exclusion.
Rocklee argues that an intention to cover claims such as are here involved can be derived from the fact that the policy exclusion only refers to discharge, dispersal, release or escape. Rocklee asserts that the drafters of the exclusionary language specifically determined not to include "dumping" within the exclusion. Plaintiff implicitly suggests that dumping is an activity which might be performed by third parties rather than the insured, a thesis of dubious validity. While there may well be a host of synonyms which could have been added to the exclusion (plaintiff's brief references nine additional synonyms), a failure to convert an insurance policy into a veritable thesaurus cannot serve to create ambiguity where none exists. To view dumping as something not embraced within the words "discharge, dispersal or release or escape" is to treat language in a fashion reminiscent of Humpty Dumpty in Alice Through the Looking Glass. Among the definitions of the word "dump," as defined by Webster's New Riverside University Dictionary, are the following: "to throw down or release in a large mass;" "to discharge contents or cargo." See also The American Heritage Dictionary (2 Coll. ed.). In addition, the *530 fact that a third party may have "dumped" oil on Rocklee's property, without more, cannot generate liability coverage. It is only through further dissemination to neighboring properties, whether styled as dispersal, release or otherwise, that liability can arise. Indeed, in Broadwell Realty, supra, 218 N.J. Super. at 519, 528 A.2d 76, the Appellate Division described the spreading of gasoline to adjacent properties as the product of a "release." See also State D.E.P. v. Signa Trading Intern., 235 N.J. Super. 321, 335, 562 A.2d 251 (App.Div. 1989) which refers to Broadwell Realty as permitting coverage for expenditures incurred where pollutants had "escaped" from the insured's property.
Rocklee argues that the insured "reasonably expected" that it had obtained coverage for liability in the event someone unrelated to and not authorized by the insured dumped oil upon its property and that that expectation should not be "frustrated." To trigger invocation of the doctrine of "reasonable expectations," it is generally necessary that one find appropriate policy language within the arsenal which constitutes the policy of insurance. Reasonable expectations must be based on policy language, not on an abstract conception of what should or might be the subject of coverage. DiOrio v. N.J.M., 79 N.J. 257, 270, 398 A.2d 1274 (1979); Sinopoli, supra, 244 N.J. Super. at 251, 581 A.2d 1368. See also Alcolac, supra, 716 F. Supp. at 1549. Only genuine interpretational difficulties engage the doctrine of ambiguities. Broadwell Realty, supra, 218 N.J. Super. at 527, 528 A.2d 76; American White Cross v. Continental Ins. Co., 202 N.J. Super. 372, 381, 495 A.2d 152 (App.Div. 1987). A "genuine ambiguity" only arises "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo, supra, 81 N.J. at 247, 405 A.2d 788. Given the clarity of the language of the exclusion, the prominence of the separate notice, and the fact that that notice specifically recited that *531 cleanup costs were not covered, the argument is strained. Contrast Gerhardt v. Continental Ins. Co., 48 N.J. 291, 225 A.2d 328 (1966).
Courts are not at liberty to judicially create or impose contractual obligations simply because those obligations might be viewed as socially desirable. Courts are not free, "even under the guise of good faith and peculiar circumstances, to alter the terms of an otherwise unambiguous contract." Sinopoli, supra, 244 N.J. Super. at 251, 581 A.2d 1368. Longobardi, supra, 121 N.J. at 537, 582 A.2d 1257. Werner Industries, supra, 112 N.J. at 35, 548 A.2d 188. Competing public policy considerations cannot serve as a basis for circumventing contract language. Broadwell Realty, supra, 218 N.J. Super. at 523, 528 A.2d 76; Summit Assoc. v. Liberty Mut. Fire Ins., 229 N.J. Super. 56, 63-64, 550 A.2d 1235 (App.Div. 1988).
Turning to the fire insurance policy,[9] that policy is a "scheduled" policy of insurance which insures "items specifically described." The only "items specifically described" are a "frame building occupied as an office and leased garage space." The only damages sustained by Rocklee were to soil. Soil is not scheduled property and is not covered. See Judah v. State Farm Fire & Cas. Co., 227 Cal. App.3d 1133, 266 Cal. Rptr. 455, review granted 268 Cal. Rptr. 541, 789 P.2d 341 (1990); La Bato v. State Farm Fire & Cas. Co., 263 Cal. Rptr. 382, 215 Cal. App.3d 336 (1989); Gibson v. Secretary of U.S. Dept. of Housing, 479 F. Supp. 3 (M.D.Pa. 1978). The policy also "covers expense incurred in the removal of debris of the property covered hereunder.... "Contaminated soil is neither debris[10] *532 nor does its removal equate with "removal of debris of the property covered hereunder;" i.e., of the buildings specifically described in the policy. See Lexington Ins. Co. v. Ryder System, Inc., 142 Ga. App. 36, 234 S.E.2d 839 (1977). Since soil is not covered in the first instance, a specific exclusion is unnecessary. La Bato, supra; Gibson, supra.[11]
Expenses for remediation simply are not covered under either policy of insurance. Counsel for Selective is directed to submit an appropriate judgement.
NOTES
[1] Those activities have spawned a number of different claims against AET which are not specifically implicated by the subject summary judgement motion.
[2] At argument Selective contended, for the first time, that Rocklee had been directed to take remedial action by the Bergen County Department of Health Services, Environmental Division, and that remediation expenses incurred pursuant to "governmental ... order, direction or request are clearly and explicitly excluded. Plaintiffs countered to suggest that the County of Bergen did not order, direct or request removal, that the county did not have jurisdiction or authority to order remediation since Rocklee was not the polluter and that remediation was accomplished by Rocklee for reasons unrelated to governmental direction or request. Since the applicability of the language quoted in this footnote was not previously addressed, and since resolution may be fact sensitive, I will not address the potential applicability of the specific exclusion for expenses incurred pursuant to governmental order or request. Nonetheless, the scope and breadth of the entire exclusion should be considered in evaluating the assured's reasonable expectations.
[3] General liability policies generally exclude coverage for damage to the insured's property, as does the policy involved in this case.
[4] Separate coverage for pollution related claims apparently remains available. See New Castle County v. Hartford Acc. and Indem. Co., 673 F. Supp. 1359, 1363 (D.Del. 1987), which references the availability of environmental impairment liability policies.
[5] The actual issue addressed in Molton, Allen, as subsequently expressed by the same court, was whether sand qualified as a pollutant. See Hicks v. American Resources Ins. Co., 544 So.2d 952 (Ala.Sup.Ct. 1989).
[6] Nor has plaintiff sought opportunity to do so.
[7] "Every individual endeavors to employ his capital so that its produce may be of greatest value. He generally neither intends to promote the public interest, nor knows how much he is promoting it. He intends only his own security, only his own gain. And he is in this lead by an invisible hand...." Samuelson, Economics (4 ed 1958) at 36 (quoting Adam Smith, Wealth of Nations).
[8] The predicate for plaintiff's thesis, which cannot be sourced to the language of the exclusion, is obscure. In Kurt Vonnegut, Jr.'s novel, Slaughterhouse Five, Billy Pilgrim, an American soldier in Germany during World War II, experienced the devastation of the fire-bombings of Dresden. Approximately 135,000 civilians were purportedly killed. Billy Pilgrim returned to the United States emotionally scarred and was institutionalized because "he was going crazy." The doctors, however, "didn't think it had anything to do with the war. They were sure Billy was going to pieces because his father had thrown him into the deep end of the Y.M.C.A. swimming pool when he was a little boy, and had taken him to the rim of the Grand Canyon." Vonnegut, Slaughterhouse Five (Dell ed. 1969) at 100.
[9] That policy might preferably be characterized as a first party property damage policy.
[10] "Debris" is defined as the "remains of something broken or destroyed." The American Heritage Dictionary (2 Coll. ed.)
[11] The presence of an exclusion which stipulated that "lawns, outdoor trees, shrubs and plants" are not covered "except as provided in the Extension of Coverage" does not create ambiguity. The extension provides coverage for trees, shrubs and plants if damaged by specific named perils up to a limit of $1,000. An exclusion is necessary to restrict such coverage to that limit. In general, policy exclusions cannot be relied on to create ambiguities enhancing coverage. Exclusionary clauses "subtract from coverage rather than grant it." Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247, 405 A.2d 788 (1979); Com'l Union Ins. Co. v. Chubb Group of Inc., 101 N.J. 24, 499 A.2d 1362 (1985), reversing the Appellate Division's decision on the basis of the dissent 194 N.J. Super. 69, 80-81, 476 A.2d 290 (App.Div. 1984). A substantially similar extension of coverage was provided for in the policy involved in Judah, supra. The court there held that the policy was clear and did not extend coverage for damage to land.